IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LAURA V., | ) | |
| | ) | |
| Plaintiff, | ) | No.  19-CV-03379 |
| | ) | |
| v. | ) | |
| | ) | |
| KILOLO KIJAKAZI, | ) | Honorable Jeffrey I. Cummings |
| Acting Commissioner of Social Security, [1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant, Laura V. ("Claimant") brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security (the "Commissioner") that denied her claim for Disability Insurance Benefits ("DIBs") and Supplemental Security Income under 42 U.S.C. §§416(i) and 423(d) of the Social Security Act (the "Act").  The Commissioner has brought a cross-motion for summary judgment seeking to uphold its decision to deny benefits.  The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c).  This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).  For the reasons stated below, Claimant's motion for summary judgment (Dckt. #13) is granted, and the Commissioner's motion for summary judgment (Dckt. #17) is denied.

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021.  Accordingly, pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this case.  Furthermore, Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion.  Therefore, only the claimant's first name shall be listed in the caption.  Thereafter, we shall refer to Laura V. as Claimant.

I.        **BACKGROUND**

        A.        **Procedural History**

On November 17, 2016, Claimant filed a DIBs application pursuant to Title II, alleging a disability onset date of July 1, 2015. (Record ("R.") 177, 195). Her claim was denied initially on April 3, 2017 and upon reconsideration on October 10, 2017. (R. 111-18). On May 10, 2018, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. (R. 10-28). The Appeals Council denied review on April 19, 2019, making the ALJ's decision the Commissioner's final decision. (R. 1-3). *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed her complaint for administrative review in the District Court on May 20, 2019. (Dckt. #1).

        B.        **The Social Security Administration Standard To Recover Benefits**

In order to qualify for disability benefits, a claimant must demonstrate that she is disabled. An individual does so by showing that she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step

two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if she can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

    **C.**    **The Evidence Presented to the ALJ**

The administrative record contains the following evidence regarding Claimant's mental health that bears on the issues discussed by the Court in this decision.[2]

    **1.**    **Evidence from healthcare providers who provided Claimant with treatment related to her mental health**

On July 30, 2015, Claimant sought treatment from Dr. Judith Anderson Sherman (a family practice physician) with a complaint of depression. (R. 333). Claimant reported to Dr. Sherman that she was crying daily, had difficulty concentrating, and was under stress at work

---

[2] Claimant's appeal also raises issues related to the ALJ's consideration of her degenerative disc disease in her lumbar spine and the multiple surgeries on her left knee. However, because remand is warranted based upon the ALJ's handling of issues pertaining to Claimant's mental health, the Court will not address the allegedly disabling physical conditions.

3

due to sexual and verbal harassment from a supervisor. (R. 335). Dr. Sherman, who noted that Claimant was "easily tearful and mildly anxious," diagnosed Claimant with situational depression and anxiety. (R. 335). Dr. Sherman also refilled Claimant's prescription for Xanax to assist her with managing her anxiety and she issued Claimant a prescription for Lexapro (Escitalopram Oxalate) to treat her depression. (R. 336). Additionally, Dr. Sherman encouraged Claimant to obtain the forms needed to receive the FMLA leave of absence from work that she desired. (R. 336).

On October 27, 2016, Claimant presented to psychiatrist Maleeha Ahsan at the Advocate Medical Group for a behavioral health initial evaluation. (R. 494). Claimant reported a variety of complaints including anxiety, depression, crying episodes, poor focus and concentration, and a history of panic attacks in the past. (R. 494). Dr. Ahsan observed that Claimant had a decrease in concentrating ability with racing thoughts and that she was anxious and depressed. (R. 496). Dr. Ahsan assessed Claimant as having problems with alcohol abuse and dependence, anxiety, and "severe episode[s] of recurrent major depressive disorder w/psychotic features." (R. 496). Dr. Ahsan also determined that Claimant's score on the Global Assessment of Functioning ("GAF") scale was a 45.[3] (R. 497). Dr. Ahsan prescribed medication (Lexapro and Hydroxyzine) to treat Claimant's anxiety and depression and she recommended that Claimant

---

[3] The GAF is "a scale of 1 to 100 used by mental health clinicians and physicians to help determine how well a person is doing in adjusting to the psychological and other challenges of living; the higher the score, the better [s]he's doing." *Price v. Colvin,* 794 F.3d 836, 839 (7th Cir. 2015). A GAF "score between 41 and 50 signifies serious psychiatric illness." *Voight v. Colvin,* 781 Fed.Appx. 871, 874 (7th Cir. 2015). Although the GAF has been criticized for subjectivity and is no longer widely used by psychiatrists and psychologists, *Price,* 794 F.3d at 839, the Social Security Administration – contrary to the Commissioner's contention (R. 18 at 4) – "still considers these scores as relevant, medical-opinion evidence" and it instructs ALJs to treat them accordingly. *Knapp v. Berryhill,* 741 Fed.Appx. 324, 329 (7th Cir. 2018); *Gersner v. Berryhill,* 879 F.3d 257, 263 n.1 (7th Cir. 2018); *Elizabeth A.D. v. Saul,* No. 19 C 6024, 2021 WL 148831, at *11 (N.D.Ill. Jan. 15, 2021).

begin psychotherapy. (R. 497). Claimant subsequently began therapy with Cynthia Matook, a licensed clinical social worker who was also part of the Advocate Medical Group.

Dr. Ashan and LCSW Matook collectively treated Claimant between October 27, 2016 and October 11, 2018. (R. 494, 1282). In their medical records, Dr. Ashan and LCSW Matook documented Claimant's complaints regarding a variety of debilitating symptoms over that time period. Among other things, Claimant reported that she was having:

> **panic attacks, including one that lasted more than 4 hours** (Dr. Ashan's records: R. 494 (10-27-16); R. 673 (5-10-17); R. 1305 (10-18-17); R. 1304 (10-25-17); LCSW Matook's records: R. 1337 (2-8-17); R 1327 (4-16-17); R. 1325 (4-20-17); R. 1306 (9-26-17); R. 1283 (9-11-18));
>
> **a panic attack during the course of one appointment** (Dr. Ashan's records: R. 1287 (7-24-18));
>
> **crying episodes** (Dr. Ashan's records: R. 494 (10-27-16; R. 675 (3-15-17); R. 673 (5-10-17); R. 721 (6-12-17); R. 1295 (2-28-18); R. 1287 (7-24-18); R. 1282 (9-17-18); LCSW Matook's records: R. 1291 (5-15-18); R. 1285 (8-21-18));
>
> **difficulty sleeping** (Dr. Ashan's records: R. 494 (10-27-16); R. 673 (5-10-17); R. 721 (6-12-17); R. 1304 (10-25-17); R. 1301 (11-08-17); R. 1298 (1-11-18); R. 1287 (7-24-18); R. 1284 (8-27-18); R. 1282 (9-17-18); LCSW Matook's records: R. 1337 (2-8-17); R. 1335 (2-23-17); R. 1318 (5-31-17); R. 1306 (9-26-17); R. 1303 (10-26-17); R. 1299 (12-7-17); R. 1297 (1-18-18); R. 1290 (6-13-18); R. 1289 (7-2-18); R. 1286 (7-25-18); R. 1283 (9-11-18); R. 1281 (9-24-18));
>
> **difficulty concentrating/focusing** (Dr. Ashan's records: R. 494 (10-27-16); R. 673 (5-10-17); R. 1309 (8-2-17); R. 1287 (7-24-18); LCSW Matook's records: R. 1329 (3-29-17); R. 1325 (4-20-17); R. 1313 (7-6-17); R. 1311 (7-24-17); R. 1308 (8-8-17); R. 1299 (12-7-17); R. 1293 (4-24-18));
>
> **low energy** (Dr. Ashan's records: R. 494 (10-27-16); R. 677 (2-1-17); R. 673 (5-10-17); R. 1295 (2-28-18); LCSW Matook's records: R. 491 (11-3-16); R. 1337 (2-8-17); R. 1333 (3-9-17); R. 1311 (7-24-17); R. 1297 (1-18-18));
>
> **difficulty getting out of bed** (Dr. Ashan's records: R. 1309 (8-2-17); R. 1287 (7-24-18); and
>
> **difficulty leaving her house** (Dr. Ashan's records: R. 675 (3-15-17); R. 673 (5-10-17); LCSW Matook's records: R. 1337 (2-8-17));

5

**feelings of isolation and withdrawal** (LCSW Matook's records: R. 1303 (10-26-17); R. 1302 (11-6-17); R. 1286 (7-25-18); R. 1280 (10-11-18)); and

**issues with anger and being irritable** (LCSW Matook's records: R. 1341 (11-17-16); R. 1291 (5-15-18); R. 1289 (7-2-18)).

Based on their observations of Claimant, Dr. Ashan and LCSW Matook documented within the medical records their findings that Claimant:

**manifested a decreased ability to concentrate** (Dr. Ashan's records: R. 494 (10-27-16); R. 673 (5-10-17); LCSW Matook's records: R. 1329 (3-29-17); R. 1318 (5-31-17); R. 1308 (8-8-17); R. 1307 (8-22-17); R. 1306 (9-26-17); R. 1299 (12-7-17); R. 1293 (4-24-18); R. 1290 (6-13-18); R. 1289 (7-2-18); R. 1281 (9-24-18); R. 1280 (10-11-18));

**was depressed and anxious** (Dr. Ashan's records: R. 494 (10-27-16); R. 673 (5-10-17); R. 675 (3-15-17); R. 677 (2-1-17); R. 721 (6-12-17); R. 1309 (8-2-17); R. 1304 (10-25-17); R. 1298 (1-11-18); R. 1295 (2-28-18); R. 1287 (7-24-18); R. 1284 (8-27-18); R. 1282 (9-17-18); LCSW Matook's records: R. 1337 (2-8-17); R. 1335 (2-23-17); R. 1329 (3-29-17); R. 1327 (4-16-17); R. 1318 (5-31-17); R. 1311 (7-24-17); R. 1303 (10-26-17); R. 1302 (11-6-17); R. 1297 (1-18-18); R. 1291 (5-15-18); R. 1290 (6-13-18); R. 1286 (7-25-18); R. 1281 (9-24-18); R. 1280 (10-11-18)); and

**was irritable** (LCSW Matook's records: R. 1302 (11-16-17); R. 1291 (5-15-18); R. 1283 (9-11-18)).

Dr. Ashan ordered refills of Claimant's prior prescriptions, increased dosages, and new prescriptions for a number of different medications to treat Claimant's depression, anxiety, and poor concentration. These medications included Lexapro and Hydroxyzine on October 27, 2016; Atarax on February 17, 2017; Venlafaxine on March 15, 2017; Seroquel, Effexor, and Buspirone (Wellbutrin) on June 12, 2017; and Deplin on August 2, 2017. (R. 682, 678, 1332, 672, 720).

Dr. Ashan also completed two "treating physician social security medical questionnaire" forms that she returned to Claimant's counsel. (R. 1347-1349; 728-731). In the first questionnaire, which she completed on March 28, 2017, Dr. Ashan indicated that Claimant had a diagnosis of alcohol dependence, generalized anxiety disorder, and major depression. (R. 1347).

6

She further noted that Claimant had difficulty concentrating or thinking, decreased energy, and suffered from drowsiness and fatigue as a consequence of the medication she was taking. (R. 1347). Dr. Ashan opined that Claimant's mental health conditions would preclude her from maintaining attention and concentration and from completing a normal workday and workweek without interruption from psychologically based symptoms for 30% or more of an eight-hour work day and that Claimant would be limited to a lesser degree with respect to a number of other work functions. (R. 1348-1349).

In her second questionnaire, which she completed well over a year later on August 27, 2018, Dr. Ashan reiterated Claimant's diagnosis of major depression and generalized anxiety disorder and identified the multiple additional medications that she had prescribed for Claimant. (R. 728). Dr. Ashan noted that Claimant had difficulty concentrating or thinking and decreased energy, was very anxious, and could not deal with the general public. (R. 728-729). Dr. Ashan further noted that Claimant suffered from sleep disturbances, a poor memory, and panic attacks that rendered her unable to function independently outside of her home. (R. 728-729). Dr. Ashan opined that Claimant would be unable to perform every listed function related to social interaction, adaption, understanding and memory, and sustained concentration and memory for 30% or more of an eight-hour workday. (R. 729-730). Finally, Dr. Ashan concluded that Claimant would likely be absent from work for more than four days a month on account of her impairments or treatment. (R. 729-731).

### 2. Evidence from Agency Consultants

On March 3, 2017, Tyrone Hollerauer, PsyD (a psychologist) reviewed Claimant's mental health medical records, and determined that she suffers from depression, anxiety and obsessive compulsive disorder. (R. 87). Dr. Hollerauer determined that Claimant had a mild limitation with respect to her ability to: (a) understand, remember, and apply information; (b)

7

interact with others; (c) concentrate, persist or maintain pace; and (d) to adapt or manage herself and he further found that Claimant's mental impairments were non-severe. (*Id.*). On September 29, 2017, at the reconsideration stage, R. Leon Jackson, Ph.D (a psychologist) reviewed Claimant's updated treatment records and noted the additional medications that Dr. Ashan had prescribed for her. (R. 100-102). Nonetheless, Dr. Jackson's conclusions regarding Claimant's diagnosis and the limitations on Claimant's mental abilities were identical to those of Dr. Hollerauer. (R. 102).

### 3. Claimant's testimony at the administrative hearing

On November 20, 2018, Claimant provided testimonial evidence at a hearing before ALJ Edward Studzinski. (R. 35-60). Claimant testified that she was depressed every day and that she suffered panic attacks between twice a week to twice a month. (R. 49-50). The panic attacks – which sometimes occur while Claimant is driving – last for a couple of hours and she has to take Xanax to cope with them. (R. 50-51, 59). The Xanax tires Claimant to the point where she has to lie down for an hour and it saps her energy for the remainder of the day. (R. 52-53). Claimant further testified that: (1) her memory is bad; (2) she has trouble concentrating; (3) she gets out of bed five to six times each night and has difficulty sleeping through the night; and (4) she takes naps for periods of 30 minutes to two hours each day. (R. 54, 56-57).

The ALJ observed that Claimant was crying throughout the hearing and he asked her why. (R. 58). Claimant explained that she was feeling very nervous and that her anxiety level was high. (R. 58). Claimant further explained that she had quit her last job as a branch manager at a transmission part company where she had worked for two years because she found the job to be extremely stressful and she cried almost every day. (R. 40-41). Claimant quit her prior job as an administrative assistant and bookkeeper – which she had held for fifteen years – because she was crying all the time and would have to leave the building constantly. (R. 42).

### 4. Testimony from the vocational expert

The Vocational Expert ("VE") reported that a hypothetical person with Claimant's RFC would not be able to perform any of her past relevant work; however, this person would still retain the ability to perform light work as a housekeeper or laundry folder. (R. 68). The VE further reported that this person would only be allowed two absences per month or a total of 14 days annually, and can only be off task up to 15 percent of the workday. (R. 70). Additionally, the VE testified that if the person was further limited to never being able to crouch all the work at the light level would be ruled out, but there would still be work available at the sedentary level. (R. 70-1).

## II. THE ADMINISTRATIVE LAW JUDGE'S DECISION

On March 6, 2019, the ALJ issued a decision finding Claimant not disabled. (R. 10). Applying the five-step sequential evaluation that governs disability cases, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since her alleged onset date of July 1, 2015. Her severe impairments at Step 2 were "joint dysfunction, obesity, anxiety and depression." (R. 15). With respect to the severity of Claimant's mental impairments, the ALJ found that Claimant had moderate limitations with respect to: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing herself. (R. 16-17). Nonetheless, the ALJ determined at Step 3 that none of Claimant's impairments or combination of impairments met or equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 15).

Prior to moving to Step 4, the ALJ formulated Claimant's RFC. (R. 17-18). With respect to Claimant's mental capabilities, the RFC stated:

> The claimant is further limited to simple routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. She ought not perform work

9

which requires multitasking. She could perform work requiring an average production pace, but is incapable of significantly above average or highly variable production pace work. She ought not perform work which requires significant self-direction. She is further precluded from work involving direct public services, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the public, which is incidental to her primary job duties. She is unable to work in crowded, hectic environments. The claimant can tolerate brief and superficial interaction with supervisors and coworkers, but is not to engage in tandem tasks.

(R. 18). The ALJ stated that his RFC was "supported by the minimal objective findings, the treatment record, the opinion of the state agency consultants (Exhibits 1A and 3A), and the lack of support in the medical record for the claimant's testimony."

Based on these conclusions, the ALJ determined at Step 4 that Claimant could not perform any of her past relevant work. (R. 26). At Step 5, however, the ALJ determined that a sufficient number of jobs existed in the national economy that a person with Claimant's RFC could perform and he found that Claimant is not disabled under the SSA. (R. 27).

## III. STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul,* 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, by making independent symptom evaluations, or by otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## IV. DISCUSSION

The parties agree that the ALJ's decision is flawed and beset by a number of errors. Indeed, the Commissioner opens her brief with the admission that "[t]he ALJ's decision may not be perfect" and she goes on to candidly acknowledge that the ALJ made a number of errors. *See, e.g.,* R. 18 at 2 ("the ALJ wrongly found that treating psychiatrist Dr. Ashan's reports lacked objective findings" because "Dr. Ashans's findings admittedly contain[] objective medical findings, such as anxiety, depression, irritability, restlessness, racing thoughts, etc."), at 4 ("the ALJ erroneously relied on his observation that plaintiff's alleged panic attacks were never witnessed by medical personnel"). The question before the Court is whether these errors (and others) were harmless in the sense that the Court is convinced that the ALJ would reach the same result on remand even if the errors were corrected. *See, e.g., Lambert v. Berryhill,* 896 F.3d 768, 776 (7th Cir. 2018) ("An error is harmless only if we are convinced that the ALJ would reach the

11

same result on remand"). For the reasons stated below, the Court finds that the outcome would not be "foreordained" on remand if the errors were corrected. *Id.* Accordingly, the errors are not "harmless" and remand is required.

> **A. The ALJ's explanation for rejecting the opinions of Claimant's treating psychiatrist is unsound**

It is well-settled that "[a]n ALJ must give 'controlling weight' to a treating source's opinion if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011), *quoting* 20 C.F.R. §404.1527(d)(2).[4] "[M]edically acceptable clinical and laboratory diagnostic techniques include consideration of a patient's report of complaints, or history, as an essential diagnostic tool." *Burgess v. Astrue,* 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks omitted). "[W]henever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio,* 630 F.3d at 710; *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir. 2011).

As explained above, Dr. Maleeha Ashan was Claimant's treating psychiatrist and she provided medical opinions regarding Claimant in her March 28, 2017 and August 27, 2018 medical questionnaires. The ALJ gave "little weight" to the opinions expressed by Dr. Ashan in her March 2017 questionnaire based on his conclusion that there "are not findings in the treatment records" to support the limitations that she found. (R. 25). In this questionnaire, Dr. Ashan: (1) noted that Claimant had difficulty concentrating or thinking, decreased energy, and

---

[4] For claims filed on or after March 27, 2017, the treating physician rule has been modified to eliminate the controlling weight instruction. *Kaminski v. Berryhill*, 894 F.3d 870, 876 (7th Cir. 2018), *amended on reh'g* (Aug. 30, 2018).

12

suffered from drowsiness and fatigue as a consequence of the medication she was taking; and (2) opined that Claimant's mental health conditions would preclude her from maintaining attention and concentration and from completing a normal workday and workweek without interruption from psychologically based symptoms for 30% or more of an eight-hour workday and that Claimant would be limited to a lesser degree with respect to a number of other work functions. (R. 1347-1349).

Similarly, the ALJ gave "limited weight" to Dr. Ashan's August 2018 opinions based on his conclusion that there was a "lack of objective medical findings on mental status examination" and because they were "inconsistent with the treatment evidence of record." (R. 25). In this questionnaire, Dr. Ashan: (1) identified the multiple additional medications that she had prescribed for Claimant to address her major depression and anxiety; (2) noted that Claimant had difficulty concentrating, decreased energy, anxiety, an inability to deal with the general public, sleep disturbances, poor memory, and panic attacks; and (3) opined that Claimant would be unable to perform every listed function related to social interaction, adaption, understanding and memory, and sustained concentration for 30% or more of an eight-hour workday and, further, that Claimant would likely be absent from work for more than four days a month on account of her impairments and treatments. (R.728-731).

The ALJ's reasons for giving little weight to Dr. Ashan's opinions are unsound. To begin, there are findings in the medical record to support Dr. Ashan's March 2017 opinions. As detailed above in Section C1, notations in the medical records prior to the date the March 2017 questionnaire was prepared document that Claimant was experiencing a decreased ability to concentrate, low energy, depression, anxiety, and difficulty sleeping. Moreover, Claimant's score on the GAF scale indicated that she had a serious psychiatric illness. *Supra,* at n.3. With

13

respect to the August 2018 opinions, as the Commissioner concedes (Dckt. #18 at 1) and the record (detailed in Section C1) shows, there *were* objective findings to support Dr. Ashan's more dire opinions. In particular, the medical record shows that Claimant's overall condition worsened between March 2017 and August 2018.[5] *See Lambert*, 896 F.3d at 775 ("Physicians may update their views without being inconsistent if their later opinions are based on a patient's changed condition"); *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir. 2010) (a check-box form takes on greater significance when it supported by the medical records). The ALJ's failure to consider the findings in the medical record that support Dr. Ashan's opinions was error and failed to build an accurate and logical bridge between the evidence and the result. *Larson,* 615 F.3d at 774-75.

Moreover, the ALJ failed to specify what portions of the treatment record were inconsistent with Dr. Ashan's opinions. Presumably, the ALJ refers to the notations in the medical record which indicated that Claimant, at times, had normal thought processes, concentration, and memory. (R. 16-17). The ALJ also deemed the mental status examinations "inconsistent" because Claimant "sometimes [had] normal concentration and focus, and sometimes [had] difficulty concentrating." (R. 17). This observation ignores the Seventh Circuit's repeated admonition that "a person who suffers from mental illness will have better

---

[5] The Court recognizes that Claimant's counsel was unable to direct the ALJ to the particular citations to the medical record when the ALJ asked counsel to provide support for Dr. Ashan's opinions. (R. 61-64). This was unfortunate, and it is possible that the ALJ might have made different findings if he had been directed to the pertinent portions of the record. For example, the ALJ rejected the evidence as to the severity and frequency of Claimant's panic attacks based on his belief that no medical personnel witnessed her having a panic attack. (R. 19, 62). However, Dr. Ashan *did* witness Claimant having a panic attack during the course of her July 24, 2018 appointment. (R. 1287). Notwithstanding the fact that counsel did not have the citations at his fingertips, the ALJ had an independent duty to investigate the factual record to determine whether a grant of benefits was warranted due to the non-adversarial nature of a hearing on disability benefits. *See, e.g., Smith v. Comm'r of Soc. Sec.,* No. 5:17-CV-0488 (GTS), 2018 WL 684337, at *7 (N.D.N.Y. Apr. 5, 2018) (citing cases).

14

days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio,* 630 F.3d at 710 (citing cases), at 712 ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace") (internal quotation marks omitted). "The ALJ was not permitted to 'cherry-pick' from these mixed results to support a denial of benefits." *Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011); *Stephens v. Berryhill*, 888 F.3d 323, 329 (7th Cir. 2018) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.").

### B. Even assuming that the ALJ had valid reasons for discounting Dr. Ashan's opinions, the ALJ did not apply the correct legal standard in determining what weight to assign to them

Even where – as here – "the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ is not permitted to simply disregard it." *Scrogham v. Colvin,* 765 F.3d 685, 697 (7th Cir. 2014). Rather, as the Seventh Circuit has made clear:

> the ALJ is required by regulation to consider certain factors in order to decide how much weight to give the opinion: (1) the '[l]ength of the treatment relationship and the frequency of examination,' because the longer a treating physician has seen a claimant, and particularly if the treating physician has seen the claimant 'long enough to have obtained a longitudinal picture' of the impairment, the more weight his opinion deserves; (2) the '[n]ature and extent of the treatment relationship'; (3) '[s]upportability,' i.e., whether a physician's opinion is supported by relevant evidence, such as 'medical signs and laboratory findings'; (4) consistency 'with the record as a whole'; and (5) whether the treating physician was a specialist in the relevant area.

*Id., quoting* 20 C.F.R. §404.1527(c)(2)-(5). The purpose of the regulatory factors is to guide the ALJ's reasoning when deciding what amount of weight to assign to the treating physician's opinion. *Id.*, at 698 (when an ALJ fails to discuss the regulatory factors, a reviewing court "cannot assess whether she appropriately" determined how much weight to assign). The

15

Seventh Circuit has also made clear that "[a]n inadequate evaluation of a treating physician's opinion *requires* remand" unless the failure to do so is found to be harmless error. *Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017) (emphasis added); *Karr,* 989 F.3d at 513. In determining whether the erroneous failure to apply the proper legal standard is harmless, the Court looks to the record to see if it can predict with great confidence what the result on remand would be. *Karr,* 989 F.3d at 513.

In this case, the ALJ failed to apply the regulatory framework set forth above to evaluate what weight that Dr. Ashan's opinions should be given. Had the ALJ considered the relevant factors, including the nature of the treatment relationship, the frequency of examination, Dr. Ashan's specialty (psychiatrist), the type of test performed (e.g., the GAF assessment), and the reliability of the opinion in light of the record as a whole, it is likely the ALJ would have accorded her opinions more weight. *See, e.g., Eakin v. Astrue,* 432 Fed.Appx. 607, 612 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (determining that "[p]roper consideration of these factors may have caused the ALJ to accord greater weight" to the treating physician's opinion). Accordingly, the ALJ's failure to follow the proper legal framework was not harmless and remand is required for this reason as well.

  **C.** **The ALJ erred by giving considerable weight to the opinion of the state agency consultant**

The state agency consultants (both psychologists) found in March and September 2017 that Claimant had only "mild psychiatric limitations in understanding, remembering or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. *Supra,* at Section C2. The ALJ gave "considerable weight" to their opinions, which the ALJ found "persuasive" because they were "consistent with the residual functional capacity" determined by the ALJ. (R. 25). This finding is erroneous for two reasons.

16

First, the ALJ's decision to find the consultants' opinions persuasive because they were consistent with the RFC "implies that the ALJ first determined the RFC, and then accepted or rejected the medical opinions based on whether those opinions fit the RFC" and this constitutes "reversible error." *Mounts on behalf of Mounts v. Berryhill,* No. 3:17-CV-155, 2018 WL 3238555, at *4 (N.D.Ind. July 2, 2018) (citing to *Bjornson v. Astrue,* 671 F.3d 640, 645-46 (7th Cir. 2012)); *Carolyn S. v. Saul,* No. 19 C 385, 2020 WL 231085, at *9 (N.D.Ill. Jan. 15, 2020) ("Contrary to the ALJ's assumption, however, an adjudicator 'gets things backwards' when she reverses the hierarchy by invoking the RFC to evaluate an expert's report").

Second, the consultants' opinions – which were issued in early March and September 2017 – did not take into consideration the worsening of Claimant's condition later in 2017 and in 2018. It is well settled that "ALJs may not rely on outdated opinions of agency consultants 'if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion.'" *Lambert,* 896 F.3d at 776, *quoting Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (citing cases); *see also Mary P. v. Berryhill*, No. 17-CV-06545, 2019 WL 2491640, at *7–8 (N.D.Ill. June 14, 2019) (instructing the ALJ to "submit all the medical evidence to the state agency physicians for further review and scrutiny before making a determination that relies on their opinions"). Because Claimant's post-September 2017 medical records could have reasonably changed the reviewing consultants' opinion that Claimant's psychiatric limitations were "mild," remand is warranted. *See, e.g., Meuser,* 838 F.3d at 912.

### D. The ALJ erred by rejecting Claimant's testimony concerning her psychiatric symptoms

This Court can overturn an ALJ's evaluation of a claimant's testimony regarding the severity of her symptoms only if it is patently wrong." *Phillips v. Astrue,* 413 Fed.Appx. 878,

17

886 (7th Cir. 2010); *Kevin B. v. Saul,* No. 19 C 1655, 2020 WL 2468131, at *11 (N.D.Ill. May 13, 2020). Here, Claimant testified that her prior work was so stressful that she cried daily and left work crying, she naps for 30 minutes to two hours a day, she has no energy, and she is easily upset. (R. 19). The ALJ "reject[ed] this evidence as there is no mention or support for such limitations in [her] treatment records." (R. 19).

However, the fact that Claimant has suffered from these symptoms *is* documented in her medical records. *Supra,* at Section C1. Moreover, the fact that Claimant was crying – without any apparent cause – throughout the hearing (R. 19, 58) provides further support for her testimony regarding the fragility of her psychological condition. *See Golembiewski v. Barnhart,* 322 F.3d 912, 915 (7th Cir. 2003) (factors for evaluating a claimant's symptoms under Social Security Ruling 96-7p include the degree to which claimant's asserted limitations are consistent with "the ALJ's own observations"). Under these circumstances, the Court finds that the ALJ's decision to disregard the above testimony was patently wrong. *See, e.g., Craft v. Astrue,* 539 F.3d 668, 680 (7th Cir. 2008) ("Because two of the three reasons the ALJ listed for finding Craft incredible are contradicted by the objective evidence, we conclude that the credibility determination was patently wrong, and the error cannot be deemed harmless").

E.      The ALJ must reformulate Claimant's RFC on remand

While the task of assessing a claimant's RFC is reserved to the Commissioner and not a medical expert, an ALJ must utilize "all of the relevant medical and other evidence" in the record to assess a claimant's RFC. 20 C.F.R. §404.1545(a)(3); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). The Seventh Circuit has held that an "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Furthermore, the ALJ

"must also explain how any material inconsistencies or ambiguities in the evidence [] were considered and resolved," SSR 96-8P, 1996 WL 374184, at *7, and the Seventh Circuit has made it clear that cherry-picking through the evidence contained in the record and ignoring evidence that proves disability is reversible error. *Briscoe ex rel. Taylor*, 425 F.3d at 352; *Stephens*, 888 F.3d at 329. Because the ALJ's assessment of the expert opinions and Claimant's testimony regarding her mental impairments was erroneous as explained above, the ALJ must reformulate the portion of Claimant's RFC that concerns her mental impairments after he properly assesses the evidence regarding them.

## CONCLUSION

For the reasons stated above, Claimant's motion for summary judgment (Dckt. #13) is granted, the Commissioner's cross-motion for summary judgment (Dckt. #17) is denied, and the decision of the Commissioner is reversed. This case is remanded for further proceedings consistent with this Memorandum Opinion and Order.[6]

**Dated:** **December 29, 2021**

_____
**Jeffrey I. Cummings**
**United States Magistrate Judge**

---

[6] Claimant requested – without the citation of any authority – that that this Court order that the matter "be remanded to a different ALJ." (Dckt. #13 at 16). The Commissioner objects to this request and the Court declines to order that this case be reassigned.